## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**Ellis Everett,**

    *Plaintiff,*

    v.

**Credit Control Services, Inc.,** *and*
**Experian Information Solutions, Inc.,**

    *Defendants.*

Case No.:  8:21-cv-01354-CEH-JSS

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Ellis Everett**, ("**Mr. Everett**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **Credit Control Services, Inc.,** *doing business as* **Credit Collection Services and CCS USA** ("**CCS**"), and **Experian Information Solutions, Inc.** ("**Experian**"), (jointly, "**Defendants**"), stating as follows:

### PRELIMINARY STATEMENT

1.    This is an action brought by Mr. Everett against CCS for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et. seq.* ("**FDCPA**") and the *Florida Consumer Collection Practices Act*, Section 559.55, *et seq.*, Florida Statutes ("**FCCPA**"), and against Experian for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.*, ("**FCRA**").

## JURISDICTION AND VENUE

2.    Subject matter jurisdiction for Plaintiff's federal claims arises under the FDCPA, 15 U.S.C. § 1692k(d), the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

3.    This Court has supplemental jurisdiction for Mr. Everett's FCCPA claims pursuant to 28 U.S.C. § 1367.

4.    CCS is subject to the jurisdiction of this Court pursuant to Fed. R. Civ. P 4(k) and Section 48.193, Florida Statutes.

5.    Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because the acts complained of were committed and / or caused by the Defendants, therein.

## PARTIES

6.    **Mr. Everett** is a natural person residing in Wimauma, Hillsborough County, Florida, and a *Consumer* as defined by the 15 U.S.C. § 1692a(3).

7.    **CCS** is a Delaware corporation with a primary business address of 725 Canton Street, Norwell, Massachusetts 02061.

8.    CCS is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.**

9.    CCS, doing business as Credit Collection Services, is registered with the Florida Office of Financial Regulation as a *Consumer Collection Agency* ("**CCA**"), holding license number **CCA0900641**. **SEE PLAINTIFF'S EXHIBIT A.**

10.    CCS is a *Debt Collector* within the meaning of the FDCPA, 15 U.S.C. §1692a(6), and the FCCPA, Section 559.55(7), Florida Statutes, in that it uses postal mail, and/or another instrumentality of commerce, interstate and within the state of Florida, for their business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

11.    **Experian** is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.**

12.    Experian is a nationwide *Credit Reporting Agency* ("**CRA**") within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that it, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and uses various means of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

## FACTUAL ALLEGATIONS
### The Debt

13.     In or around January 18, 2019, Mr. Everett received laboratory services related to medical issues, through Laboratory Corporation of America Holdings ("**LabCorp**").

14.     LabCorp later claimed that Mr. Everett incurred a medical debt for services allegedly not covered by insurance ("the **Debt**").

15.     The Debt arose from goods that were primarily for family, personal, or household purposes, *specifically* personal medical services, and therefore meets the definitions of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5), and the FCCPA, Section 559.55(6), Florida Statutes.

16.     Sometime in September 2019, LabCorp transferred or otherwise assigned the Debt to Radius Global Solutions, LLC ("**Radius**") for collection.

17.     As part of its collection efforts, Radius reported the Debt to several CRAs, including Experian. **SEE PLAINTIFF'S EXHIBIT B.**

18.     On January 14, 2020, Mr. Everett requested and obtained a copy of his consumer credit disclosure from Experian. *Id.*

19.     Shortly thereafter, Mr. Everett disputed the Radius tradeline to Experian.

20.    The Debt was therefore disputed by Mr. Everett at least as early as February 2020.

21.    Experian, in response to Mr. Everett's dispute, sent Radius an *Automated Consumer Dispute Verification Request* ("**ACDV**"), asking Radius to make a reasonable investigation into the dispute.

22.    Upon receipt of the ACDV, Radius knew that Mr. Everett disputed the Debt.

23.    The ACDV was sent via e-OSCAR, an online system used by CRAs to communicate with furnishers of data, such as debt collectors like Radius.

24.    Radius returned the ACDV to Experian, verifying it had completed its investigation and *agreed that its information was inaccurate and discontinued reporting the Debt*. **SEE PLAINTIFF'S EXHIBIT C.**

25.    In October 2020, LabCorp transferred or otherwise assigned the Debt to CCS for collection.

26.    On information and belief, LabCorp informed CCS of Mr. Everett's existing dispute.

27.    At the time of the transfer, LabCorp knew the Debt was disputed by Mr. Everett.

28.    CCS thereafter started reporting the identical Debt to Experian. **SEE PLAINTIFF'S EXHIBIT D.**

29.    CCS reported the same balance, account status, DOFD, original creditor and ECOA code as Radius.

30.    The only difference in the data was the "date assigned" for collection, "date of status" of the account being considered "in collection," and the "date first reported." *Id.*

31.    CCS failed to indicate that the Debt was disputed in its report concerning the Debt. *Id*

32.    CCS' reporting of the Debt caused the Debt to appear on Mr. Everett's credit report as an "non-disputed" debt.

33.    CCS' failure to disclose that the Debt was disputed materially damaged Mr. Everett's credit scores.

34.    The failure to properly report a disputed debt *as disputed* creates a concrete injury-in-fact because the failure to disclose this information affects credit scores, meaning Mr. Everett suffered "a real risk of financial harm caused by an inaccurate credit rating." *Evans v. Portfolio Recovery Associates*, 889 F. 3d 337, 345 (7th Cir 2018).

35.    CCS is a large debt collector and receives a considerable number of disputes concerning debts it reports to CRAs. CCS knew, when it received a portfolio of debts for collection from LabCorp in October 2020, which included Mr.

Everett's purported Debt, that it was not the first collection agency to be assigned the accounts.

36.     Indeed, in a collection letter sent to Mr. Everett in October 2020, CCS stated, "The above referenced account was previously serviced by another collection agency, and has since been reassigned to this office for collection." **SEE PLAINTIFF'S EXHIBIT E.**

37.     CCS thus knew—or reasonably should have known – a considerable number of the accounts had been previously disputed and had to be reported as such.

38.     Despite this, on information and belief, CCS has no policies in place to determine whether the creditor of a particular account is aware of any prior disputes by a consumer.

39.     Even assuming, *arguendo*, that LabCorp failed to disclose to CCS that the Debt was disputed, reliance on an original creditor's erroneous records is *not* a defense to an FDCPA action. *See Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011).

40.     CCS, pursuant to 15 U.S.C. § 1692g, mailed Mr. Everett a collection letter, seeking to collect the Debt from LabCorp. *Id.*

41.     CSS' letter, dated October 8, 2020 stated, "Unless you notify us within 30 days after receiving this notice that you dispute the validity of this debt, or any portion thereof, this office will assume this debt is valid." *Id.*

42.     However, at the time of the letter, Mr. Everett had *already* disputed the Debt.

43.     Thus, despite the fact Mr. Everett had previously disputed the Debt with Radius, and shortly thereafter, Radius agreed and discontinued reporting the Debt, the letter claimed CCS would consider it valid unless he disputed it *again* within the next 30 days.

44.     An unsophisticated consumer, upon receipt of CCS' letter, would believe that his prior dispute was somehow null, or had expired.

45.     However, a debt collector has no right to unilaterally nullify a consumer's dispute. *See, e.g., Evans v. Portfolio Recovery Associates*, 889 F. 3d 337 (7th Cir 2018).

46.     Indeed, after receipt of CCS' letter, Mr. Everett spent time and money to procure legal counsel for advice on how to proceed regarding the Debt.

47.     On or about February 2021, Mr. Everett submitted a dispute of CCS' tradeline to Experian.

48.     CCS' tradeline was thereafter deleted, either by Experian or by CCS.

## <u>CCS Makes Unauthorized Disclosures of Protected Information to<br>Third Party</u>

49.     As aforementioned, CCS, in an effort to collect the Debt from Mr. Everett, mailed Mr. Everett multiple collection letters, including one letter dated October 8, 2020.  **SEE PLAINTIFF'S EXHIBIT E.**

50.     However, rather than prepare and mail the October 8, 2020 collection letter on its own, CCS sent information to a commercial mail house (the "**Mail House**").

51.     CCS disclosed highly personal information regarding Mr. Everett and the Debt to the Mail House, including:

- The nature of services rendered and the fact that the Debt concerned medical treatment;

- Mr. Everett's status as a debtor; and,

- The amount Mr. Everett supposedly owed to LabCorp.

52.     The Mail House then populated some, or all, of this information into a pre-written template, printed, and mailed the letter to Mr. Everett's residence in Florida. *Id.*

53.     The term *Communication* is defined in the FDCPA, 15 U.S.C. §1692a(3), as "the conveying of information regarding a debt directly or indirectly to any person through any medium,"

54.    CCS sent an electronic file containing information about Mr. Everett and the purported Debt to the Mail House.

55.    CCS thus "communicated" with the Mail House pursuant to 15 U.S.C. §1692a(3).

56.    CCS' communication to the Mail House involved disclosure of the Debt to a third-party with instructions to produce a collection letter and mail it to Mr. Everett, the consumer, with the objective that the correspondence would motivate the consumer to pay the alleged Debt.

57.    CCS' communication to the Mail House was therefore in connection with the collection of the Debt.

58.    The Mail House is a distinct entity not owned by CCS.

59.    The Mail House is not a consumer reporting agency as referenced in 15 U.S.C. § 1692c(b).

60.    The Mail House is not an attorney as referenced in 15 U.S.C. § 1692c(b).

61.    Mr. Everett never consented to having his personal and confidential information, concerning the Debt or otherwise, shared with any mail house.

62.    15 U.S.C. § 1692c(b) states that:

"Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent

jurisdiction, or as reasonably necessary to effectuate a post judgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the <u>consumer</u>, his <u>attorney</u>, a <u>consumer reporting agency</u> if otherwise permitted by law, the <u>creditor</u>, the <u>attorney of the creditor</u>, or the <u>attorney of the debt collector</u>." (Emphasis added).

63.     The Mail House does not fall within any of the categories listed within 15 U.S.C. § 1692c(b).

64.     Due to CCS' communication to the Mail House, information about Mr. Everett and the purported Debt, including his name, the nature of services rendered, the original creditor's name, the current creditor's name, and the amount he supposedly owes as a result, are all within possession of a third party not expressly listed within 15 U.S.C. § 1692c(b).

65.     If a debt collector "conveys information regarding the debt to a third party – informs the third party that the debt exists or provides information about the details of the debt – then the debtor may well be harmed by the spread of this information." *Brown v. Van Ru Credit Corp.*, 804 F.3d 740, 743 (6th Cir. 2015).

66.     Communications from debt collectors to mail houses are not exempt from the provisions of 1692c(b) and are "in connection with" the collection of a debt. *See Hunstein v. Preferred Collection & Mgmt. Servs.*, No. 8:19-cv-983 (11th Cir. April 21, 2021).

67.     CCS devised this strategy of communicating to a third-party mail house so that it could churn out more collection letters than if it kept all of the work "in house."

68.     This mail house strategy allowed CCS to generate more profit and gain an advantage over competitors.

69.     In reckless pursuit of these business advantages, CCS disregarded the known, negative effects that disclosing sensitive personal information to an unauthorized third party would have on a consumer.

70.     CCS' unauthorized and prohibited communications caused Mr. Everett, a consumer who highly values his privacy, significant emotional distress since his confidential, legally protected medical and personal information had been unlawfully disseminated to third parties.

## CCS' Tradeline Regarding the Debt Contained False Information

71.     CCS, in its reports of the Debt to Experian, indicated that the "date of status" of the account was October 2020 – the date it purchased the Debt from LabCorp. *Id.*

72.     The "date of status" of a collection account indicates the date an account was first designated to be "in collection." *Cf. Baker v. Capital One Bank*, No. CV 04–1192 PHX–NVW, 2006 WL 2523440, at *4–*5 (D.Ariz. Aug. 29, 2006) ("It would be reasonable for a creditor to interpret the "Date of status" entry to refer

to the account's status as a "Collection account," as printed under the entry titled "Status."")

73.    CCS' report indicating a "date of status" of October 2020 thus falsely implies that the account first became a collection or charge-off in October 2020, even though the true date was January 2019.

74.    The "date of status" is a key point of data evaluated by many versions of FICO® credit scores, including FICO Model II, used by Experian for mortgage evaluations.

75.    The more recent the "date of status," the more adverse the information is factored against the consumer. *See Toliver v. Experian Info. Solutions, Inc.*, 973 F. Supp. 2d 707 (S.D. Tex. 2013) "(Plaintiff) has produced evidence to suggest that the FICO credit scoring model affords greater weight to recent delinquencies, and that the 'Aug.2011' 'Date of status' entry on her Experian credit report could make it appear as though the account became a collection account more recently than it actually did.")

76.    Further, "(a)reasonable jury could find that the 'Date of status' entry was "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Toliver*, 973 F. Supp. 2d at 727 (*citing Sepulvado v. CSC Credit Services, Inc.*, 158 F.3d 890 (5th Cir. 1998)).

77.     CCS' reporting of a false status date therefore caused Mr. Everett to suffer loss of credit and unjust damage to his credit scores, as well as to suffer from severe emotional distress in having to correct CCS' errant reports of the Debt.

### Defendants Report False Date of Account Opening

78.     CCS reported to Experian that the Debt had a "Date Opened" of October 2020 – the month which CCS was *assigned* the Debt. ***Id.***

79.     CCS' reported information is false. Mr. Everett allegedly incurred the Debt in January 2019.

80.     A reasonable and prudent reader of Mr. Everett's credit report would infer that an account indicating a balance owed to LabCorp reflecting a "Date Opened" of October 2020 means – as the plain language implies – the Debt was incurred with LabCorp in October 2020. *Toliver* at 721-22 ("Here, there is no language to indicate that 'Date opened' means anything other than the date that the consumer opened the account, as it does for the majority of accounts on (Plaintiff's) credit report…. (A) reasonable jury could find that the "Date opened" entry was misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.") (Internal quotations omitted).

81.     CCS indicated in its reports to Experian the Debt had been "first reported" in December 2020. ***Id.***

82.     As the plain language of the reporting indicates, CCS was certifying that the first time the account had been reported to a CRA was in December 2020.

83.     However, as aforementioned, the same Debt had previously been reported by Radius.

84.     CCS' false "date of first reporting" thus furthered the illusion to creditors obtaining Mr. Everett's credit report that the Debt was much more recent than it actually was.

85.     Indeed, multiple creditors, and potential creditors, have obtained Mr. Everett's Experian credit reports, which contained the CCS tradeline falsely claiming it was "first reported" in December 2020 and "opened" in October 2020.

86.     CCS' aforementioned conduct has caused Mr. Everett to suffer emotional distress and has further damaged him in that he has spent time in procuring the undersigned legal counsel to assist with charting a course of response to the Defendants' false reporting.

## Experian's Failure to Maintain Reasonable Procedures

87.     Pursuant to 15 U.S.C. § 1681i(a)(5)(C), Experian was required to "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted...."

88.   CCS reported information which had previously been deleted, changing only the "date assigned" for collection, but leaving all other information unchanged.

89.   On information and belief, Experian systems are programmed to consider information about a particular debt to be "different" so long as the debt collector reporting the debt is a different entity.

90.   The FCRA, however, requires reasonable procedures to prevent the appearance of deleted information. In the instant matter, there was zero material difference in the information reported by Radius and CCS, other than the name of the debt collector and the dates upon which it was first opened and reported.

91.   Had Experian used reasonable procedures, its systems would have flagged this previously-deleted data and blocked it from being reinserted.

92.   Additionally, on information and belief, Experian did not verify that the Radius tradeline it had previously deleted could now be verified as accurate by CCS, contrary to the requirements of 15 U.S.C. § 1681i(a)(5)(B)(i).

93.   Even assuming, *arguendo*, that Experian had obtained the FCRA-mandated verification of accuracy to insert the CCS tradeline into Mr. Everett's report, it would still be inherently unreasonable to include information from a furnisher of data when that same information, just a few months earlier, had been

deleted by Radius in response to an ACDV, indicating that the information *could not be* confirmed as accurate.

94. Experian also failed to mail written notice to Mr. Everett stating that it was reinserting previously-deleted information, albeit, by a different debt collector, disclosing the business name and address of the furnisher of information making such verification, and explaining to Mr. Everett that he has the right to add a statement disputing the accuracy of the supposed Debt.

95. As a result of the Defendant's actions, disputed unverifiable, previously-deleted information was reinserted into Mr. Everett's credit report, without the legally-required notice of dispute.

96. Experian's re-insertion of previously deleted information into Mr. Everett's credit file is the result of flawed procedures that do not flag obviously-identical accounts when reported by two separate data furnishers.

97. Indeed, on information and belief, Experian does not have procedures in place to "flag" identical credit information, such as account balance, DOFD and original creditor, when reported in separate accounts, and thus Experian regularly re-inserts previously deleted information without notifying the consumer.

98. Mr. Everett has hired the aforementioned law firm to represent him in this matter and has assigned it his right to fees and costs.

## COUNT I
## CCS' VIOLATIONS OF THE FDCPA

99.     Mr. Everett adopts and incorporates paragraphs 1 – 98 as if fully stated herein.

100.    CCS violated **15 U.S.C. § 1692c(b)** when it disclosed information about Mr. Everett's purported LabCorp debt to an unauthorized third-party mail house and the employees of that mail house in connection with the collection of the Debt.

101.    CCS violated **15 U.S.C. § 1692e and 1692e(10)** when it used misleading and deceptive means to attempt to collect a debt by:

   a.  Reporting the Debt to Experian, claiming the "status date" of the Debt (e.g., the date which the account became a collection or charge-off) was October 2020, when it was January 2019 or earlier, that the "date opened" was October 2020 when it was in 2019, and that the account had been "first reported" as of December 2020, when it had been reported since January 2020 or earlier, and;

   b.  Sending its October 8, 2020 letter to Mr. Everett, after he had disputed the Debt, stating Mr. Everett had to dispute the Debt again within 30 days, otherwise CCS would consider the debt to be valid.

102.    CCS violated **15 U.S.C. § 1692e(2)(a)** when it reported the Debt to Experian, claiming" (a) that the "status date" of the Debt (e.g., the date which the

account became a collection or charge-off) was October 2020, when it was January 2019 or earlier; (b) that the "date opened" was October 2020 when it was in 2019; and, (c) that the account had been "first reported" as of December 2020, when it had been reported since January 2020 or earlier.

103.   CCS violated **15 U.S.C. § 1692e(8)** when it communicated credit information known to be false, specifically, the "status date" of the Debt (e.g., the date which the account became a collection or charge-off) was October 2020, when it was January 2020 or earlier, that the "date opened" was October 2020 when it was in 2019, and that the account had been "first reported" as of December 2020, when it had been reported since January 2020 or earlier.

104.   CCS' conduct renders it liable for the above-stated violations of the FDCPA.

**WHEREFORE,** Mr. Everett respectfully requests that this Honorable Court enter judgment against CCS, for:

a.   Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.   Actual damages, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT II
## <u>CCS' VIOLATION OF THE FCCPA</u>

105.   Mr. Everett adopts and incorporates paragraphs 1 – 98 as if fully stated herein.

106.   CCS violated **Section 559.72(5), Florida Statutes**, when it disclosed to the Mail House, a third party, information that would affect Mr. Everett's reputation, specifically details about his personal financial and medical issues, and purported unpaid bills. CCS was aware that there was no legitimate business *need* to convey this information, since CCS could easily have prepared and mailed the letter itself without any need to disclose the information to a third party.

107.   Instead, CCS *intentionally decided* to disclose this information to the Mail House as part of its debt collection effort against Mr. Everett because it allowed CCS to gain a competitive advantage over the competition through increased profit margins.

108.   CCS' conduct renders it liable for the above-stated violations of the FCCPA, and Mr. Everett is therefore entitled to statutory damages not to exceed $1,000 as well as other relief.

**WHEREFORE,** Mr. Everett respectfully requests this Honorable Court enter judgment against CCS severally, for:

a.   Statutory damages of **$1,000.00** pursuant to Section 559.77(2), Florida Statutes;

b.    Actual damages pursuant to Section 559.77(2), Florida Statutes;

c.    Injunctive relief preventing CCS from making any further communications to the unauthorized third party when attempting to collect a consumer debt.

d.    Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and,

e.    Such other relief that this Court deems just and proper.

## COUNT III
## VIOLATIONS OF FDCRA – EXPERIAN ONLY

109.    Mr. Everett adopts and incorporates paragraphs 1 – 98 as if fully stated herein.

110.    Experian violated **15 U.S.C. § 1681i(a)(5)(B)(i)** when it failed to obtain certification of accuracy of previously-deleted information, specifically, the disputed Radius tradeline, and reinserted this information into his credit file without verification via the CCS tradeline.

111.    Experian violated **15 U.S.C. § 1681i(a)(5)(B)(ii)** when it failed to provide written notice that it was reinserting previously-deleted information into Mr. Everett's credit file, when it re-inserted the disputed Radius tradeline without notice to Mr. Everett.

112.    Experian violated **15 U.S.C. § 1681i(a)(5)(B)(iii)** when it failed to provide any written notice to Mr. Everett that it was reinserting previously-

deleted information, when it re-inserted the disputed Radius tradeline without notice to Mr. Everett that a disputed tradeline was being reinserted.

113.   Experian's conduct was willful and intentional, or, alternately, was done with a reckless disregard for a consumer's rights under the FCRA to have reports produced with maximum possible accuracy and to prevent the re-insertion of previously-deleted tradelines.

114.   Experian's policies could reasonably be foreseen to cause harm to Mr. Everett.

115.   Indeed, as a result of Experian's conduct, Mr. Everett suffered damage to his credit report and scores, as well as emotional distress in having to deal with an account which he thought had been deleted as a result of his dispute.

116.   As a result of its conduct, Experian is liable to Mr. Everett, pursuant to the FCRA, for statutory damages of up to $1,000 for each occurrence, and other relief.

**WHEREFORE**, Mr. Everett respectfully requests this Honorable Court enter judgment against Experian and for him for:

a.   The greater of statutory damages of $1,000.00 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Everett's actual damages and related economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c.    Punitive damages for Experian's willful and intentional acts;

d.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C.

§1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

e.    Such other relief that this Court deems just and proper

## DEMAND FOR JURY TRIAL

Mr. Everett demands a jury trial on all issues so triable.

Respectfully submitted on June 7, 2021 by:

SERAPH LEGAL, P. A.

/s/ Bryan J. Geiger
Bryan J. Geiger, Esq.
Florida Bar No.: 119168
BGeiger@seraphlegal.com
1614 N 19th Street
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Attorney for Plaintiff*

## ATTACHED EXHIBITS LIST

A    CCS' CCA License
B    Plaintiff's Experian Consumer Disclosure, January 14, 2020 - Excerpt
C    Plaintiff's Experian Dispute Results, January 16, 2020
D    Plaintiff's Experian Consumer Disclosure, January 14, 2020 - Excerpt
E    CCS Collection Letter, dated October 8, 2020